# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

## Senior Airman ADAM B. CAGLE
## United States Air Force

## ACM 38592

## 16 July 2015

Sentence adjudged 22 November 2013 by GCM convened at Kadena Air Base, Okinawa, Japan. Military Judge: Gregory O. Friedland.

Approved Sentence: Dishonorable discharge, confinement for 3 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

Appellate Counsel for the Appellant: Captain Michael A. Schrama.

Appellate Counsel for the United States: Major Roberto Ramirez and Gerald R. Bruce, Esquire.

Before

ALLRED, SANTORO, and TELLER
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

SANTORO, Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of two specifications of sexual assault and four specifications of abusive sexual contact in violation of Article 120, UCMJ, 10 U.S.C. § 920. The adjudged and approved sentence was a dishonorable discharge, confinement for 3 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. The appellant asserts (1) several of the specifications are multiplicious, (2) the military judge erred in his instructions, (3) apparent unlawful command influence

made a fair trial or clemency consideration impossible, (4) his sentence is inappropriately severe, and (5) post-trial processing delays warrant relief.

*Background*

The appellant was friendly with another military couple, Airman AP and his wife (former Airman) CP, who also were assigned to Kadena Air Base. Mrs. CP's twin sister visited them to celebrate their 21st birthdays and to tour Japan. Although the appellant was married, he and his wife were separated, and his wife had left Okinawa. Airman AP and his wife invited the appellant to join them as they spent time with Mrs. CP's sister.

The group returned to Airman AP's home after an evening of drinking. Airman AP went to bed as he had an early-morning military appointment the following day. Mrs. CP, her sister (the victim), and the appellant settled on the couch to watch television. The victim's legs were on the appellant's lap. The appellant began massaging her feet and then, over time, worked his hands up her legs and into her pants and penetrated her vulva with his fingers. Shortly thereafter, the appellant picked the victim up, carried her to a bedroom, digitally penetrated her again and also sucked and kissed her neck and licked and kissed her breasts.

When the appellant was interviewed by investigators, he admitted all of the physical acts. However, while conceding that the victim had been drinking heavily, he told investigators that he thought she was consenting and that he thought she was drunk and had blacked out. The primary factual dispute at trial was whether the victim was capable of consenting to the appellant's conduct.

*Multiplicity*

The appellant argues that several of the specifications are unconstitutionally multiplicious. Two specifications alleged that the appellant digitally penetrated the victim's vulva. Two specifications alleged that the appellant sucked and kissed her neck. Two specifications alleged that the appellant licked and kissed her breasts.

There are three related concepts surrounding multiplicity and unreasonable multiplication of charges: multiplicity for purposes of double jeopardy, unreasonable multiplication of charges as applied to findings, and unreasonable multiplication of charges as applied to sentence.

Multiplicity in violation of the Double Jeopardy Clause of the Constitution[1] occurs when "a court, contrary to the intent of Congress, imposes multiple convictions and punishments under different statutes for the same act or course of conduct."

---

[1] U.S. Const. amend. V.

*United States v. Roderick*, 62 M.J. 425, 431 (C.A.A.F. 2006) (quoting *United States v. Teters*, 37 M.J. 370, 373 (C.M.A. 1993)). Thus, "an accused may not be convicted and punished for two offenses where one is necessarily included in the other, absent Congressional intent to permit separate punishments." *United States v. Morita*, 73 M.J. 548, 564 (A.F. Ct. Crim. App. 2014), *rev'd on other grounds*, 74 M.J. 116 (C.A.A.F. 16 March 2015).

The Supreme Court established a "separate elements test" for analyzing multiplicity issues: "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). "Accordingly, multiple convictions and punishments are permitted . . . if the two charges each have at least one separate statutory element from each other." *Morita*, 73 M.J. at 564. Where one offense is necessarily included in the other under the separate elements test, legislative intent to permit separate punishments may be expressed in the statute or its legislative history, or "it can also be presumed or inferred based on the elements of the violated statutes and their relationship to each other." *Teters*, 37 M.J. at 376–77.

Even if offenses are not multiplicious, courts may apply the doctrine of unreasonable multiplication of charges to dismiss charges and specifications. Rule for Courts-Martial 307(c)(4) summarizes this principle as follows: "What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." The government may not needlessly "pile on" charges against an accused. *United States v. Foster*, 40 M.J. 140, 144 n.4 (C.M.A. 1994). Our superior court has endorsed the following nonexhaustive list of factors to consider in determining whether unreasonable multiplication of charges has occurred:

> (1) Did the [appellant] object at trial that there was an unreasonable multiplication of charges and/or specifications?;
>
> (2) Is each charge and specification aimed at distinctly separate criminal acts?;
>
> (3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?;
>
> (4) Does the number of charges and specifications [unreasonably] increase the appellant's punitive exposure?;
>
> (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

*United States v. Quiroz*, 55 M.J. 334, 338–39 (C.A.A.F. 2001) (quoting *Teters*, 53 M.J. at 607) (line breaks added) (internal quotation marks omitted). "Unlike multiplicity, where an offense found multiplicious for findings is necessarily multiplicious for sentencing, the concept of unreasonable multiplication of charges may apply differently to findings than to sentencing." *United States v. Campbell*, 71 M.J. 19, 23 (C.A.A.F. 2012). In a case where the *Quiroz* factors indicate the unreasonable multiplication of charges principles affect sentencing more than findings, "the nature of the harm requires a remedy that focuses more appropriately on punishment than on findings." *Quiroz*, 55 M.J. at 339.

Both the appellant and the government assert that only unreasonable multiplication of charges, not multiplicity, was raised at trial. Trial defense counsel, however, argued both theories, although placed considerably more emphasis on the unreasonable multiplication argument. We therefore decline to accept the government's suggestion that we treat the issue as waived.

### a. *Digital Penetration*

The first of the two digital penetration specifications alleged that the appellant, on divers occasions, penetrated her while the victim was incapable of consenting due to impairment by alcohol. The second specification alleged the same conduct on a single occasion during the same two-day period as the first specification but eliminated the impairment element and instead substituted bodily harm.

Trial counsel's findings argument suggested that the first specification was intended to capture the conduct on the couch and the second the conduct in the bedroom. During deliberations, the members posed that question to the judge and the military judge advised them that was the government's intention. The members' findings excepted out the "on divers occasions" language and specified that the conviction on Specification 1 was based solely on the conduct that occurred on the couch.

We conclude that the members' findings mooted the multiplicity issue. The conviction for digitally penetrating the victim while she was on the couch and incapable of consenting due to alcohol impairment is not multiplicious with the conviction for digitally penetrating her in the bedroom against her will. The victim testified that she was conscious and trying to get him to stop as he digitally penetrated her in the bedroom.

### b. *Neck and Breasts*

The charging scheme for the nonpenetrative conduct was to charge the same conduct twice: first by alleging bodily harm and second by alleging that the victim was incapable of consenting due to alcohol impairment. Unlike with the penetrative conduct,

there is no dispute that exactly the same physical conduct is captured by each set of two specifications.

In attempting to distinguish the specifications, the government argues that with respect to the kissing-the-neck specifications, the first asserts that the victim "was too drunk to consent" and the second asserts that the appellant engaged in the conduct despite "being told 'no' over half a dozen times." The argument is the same with respect to the assault on the victim's breasts: the first asserts that she "was too drunk to consent" while the second alleges that the appellant engaged in that same conduct despite "being told 'no' over half a dozen times."

The problem with the government's argument is that it appears to be premised on a belief that the same victim, at the same time, can both be incapable and capable of consenting to the same act. Put another way, if the victim truly was incapable of consenting as the first specifications allege, then had she said "yes" instead of "no" half a dozen times, her state of inebriation would have made those affirmative responses legally irrelevant because, according to the government's theory, she was incapable of legally saying "yes."

The government's trial-level argument in response to the motion to dismiss (made before the evidence was presented) provides a bit more illumination. The government argued that in each case, the assault began while the victim was unconscious due to alcohol impairment but that once she awakened and told the appellant to stop, he continued. However, the government also argued that "sometimes the facts do not fit strictly into one way of charging it," an allusion to charging based on the exigencies of proof.

The victim testified that once in the bedroom, she closed her eyes to sleep and re-opened her eyes to find the appellant on top of her, kissing her neck. Although the appellant told investigators that the victim had been awake the entire time in the bedroom, the members were entitled to resolve this apparent inconsistency in the victim's favor. Therefore, we conclude that the two specifications relating to the kissing of the victim's neck were neither constitutionally multiplicious nor an unreasonable multiplication of charges.

However, the victim's testimony concerning the licking and kissing of her breasts was that she was awake the entire time and saying "no." The appellant's statement that she was awake and responding during the entire incident is consistent with her testimony on this point. This evidentiary predicate raises the legal inconsistency noted above: the victim could not at the same moment in time both be incapacitated and unable to consent, yet be capable of consenting such that her "no" had legal effect.

Although we accept the government's argument that the specifications were drafted as they were because they believed the evidence would establish that the appellant licked the victim's breasts both while she was unconscious/asleep and after she awoke and said no, the evidence ultimately did not support both theories. The evidence supports the members' guilty finding on either theory: that the victim was too impaired to be able to consent *or* that she was capable of declining consent and did so. Under these circumstances, only one of the specifications can stand. *United States v. Elespuru*, 73 M.J. 326, 329–330 (C.A.A.F. 2014). We therefore disapprove the finding of guilty for Specification 6 of the Charge.

The appellant acknowledges that he is entitled to no sentence relief as a result of our setting aside of this specification, as the military judge merged several specifications (including Specification 6) for sentencing purposes. The evidence upon which Specification 6 was based would still have properly been before the members when they determined an appropriate sentence, and thus we need not engage in sentence reassessment.

*Findings Instructions*

The appellant argues that the military judge erred when he failed to instruct the members properly concerning what it meant to be "incapable of consenting." The "incapable of consenting" language appears in Specification 1 (sexual assault on the couch), Specification 4 (touching the victim's neck), and Specification 6 (touching the victim's breasts).

With respect to Specifications 1, 4, and 6, the military judge instructed, in part:

> [E]vidence that the alleged victim consented to the sexual act, either alone or in conjunction with the other evidence in the case, may cause a reasonable doubt as to whether the accused knew or reasonably should have known that the alleged victim was incapable of consenting to the sexual act due to impairment by a drug, intoxicant, or other similar substance.

He further defined "consent" as

> a freely given agreement to the conduct at issue by a competent person. . . . Lack of consent may be inferred based on the circumstances. All the surrounding circumstances are to be considered in determining whether a person gave consent . . . .

Both Airman AP and Mrs. CP described the victim as "drunk." Concerned about the impact of that testimony, trial defense counsel requested that the military judge further instruct as follows:

> "Drunk" means any intoxication by alcohol which is sufficient to impair the rational and full exercise of the mental or physical faculties. "Drunk" is not synonymous with "incapable of consenting." A person may be intoxicated but still have the capacity to make decisions or appreciate the circumstances even if he or she might have made different decisions if completely sober.
>
> You are advised that alcohol may affect a person's memory and inhibitions without depriving him or her of volition. Further, proof of amnesia does not mean that someone lacked the capacity to consent at the time of the events they have forgotten.

The military judge declined to give that instruction.

During deliberations, the members asked for a definition of "incapable of giving consent." Trial defense counsel requested the following instruction:

> You may have heard witnesses testify that [the victim] was drunk. Drunk is not synonymous with incapable of consenting. "Drunk" means any intoxication by alcohol which is sufficient to impair the rational and full exercise of the mental or physical faculties. Incapable of consenting means that level of mental impairment due to consumption of alcohol which rendered the alleged victim unable to appraise the nature of the sexual conduct at issue, unable to physically communicate unwillingness to engage in the sexual conduct at issue, or otherwise unable to make or communicate competent decisions.

Instead, the military judge repeated his earlier definition of consent and then instructed, in part:

> Incapable of consenting, for this case, means that level of mental impairment due to consumption of alcohol which rendered [the victim] unable to freely give agreement to the conduct at issue. An incompetent person cannot consent. "Drunk" means any intoxication by alcohol which is

sufficient to impair the rational and full exercise of the mental or physical faculties. Only you, the members of the court, determine what the facts of the case are.

The appellant argues that the military judge's instructions substituted the definition of consent for a competent complainant with the definition of when a person is incapacitated (and therefore incompetent). We review de novo whether a military judge properly instructed the court members. *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003). We review for abuse of discretion a military judge's decision to provide an instruction. *United States v. Maxwell*, 45 M.J. 406, 424 (C.A.A.F. 1996).

Article 120, UCMJ, did not and does not define the term "incapable of consenting." It does, however, define "consent" and the military judge's instruction was consistent with the statutory definition. The heart of the defense's concern appears to be that because several witnesses testified that the victim was "drunk," the members might have concluded that evidence that she was "drunk" satisfied the government's burden to prove that the victim was incapable of consenting.

The witnesses were properly allowed to testify to their lay opinion that the victim was "drunk." Nevertheless, the military judge's decision to define "drunk"—a word that appeared nowhere in the statute or related definitions—was problematic. There is no evidence in the record to indicate what quantum of proof any individual witness used to determine that the victim was "drunk." The military judge's decision to define that term as he did may have led the members to conclude that a witness's opinion that the victim was drunk meant that the witness adopted the military judge's definition of the term.

The defense's proposed instruction was also problematic. First, the defense's proposed definition of incapable of consenting—"that level of mental impairment due to consumption of alcohol which rendered the alleged victim unable to appraise the nature of the sexual conduct at issue, unable to physically communicate unwillingness to engage in the sexual conduct at issue, or otherwise unable to make or communicate competent decisions"—is not found within the statute. Second, it is arguably inconsistent with the statute's definition of consent. Third, it interjected other also-undefined concepts such as competence.

Having reviewed and considered the entire record and the appellant's arguments, we are not persuaded that the military judge abused his discretion in denying the defense's proposed instruction concerning the definition of "incapable of consenting." We further conclude that the instructions he did give, both initially and in response to the members' question, accurately and properly advised them of the relevant elements and definitions.

We also considered whether the military judge's, perhaps ill-advised, decision to define the term "drunk" injected enough ambiguity to render the otherwise-correct instructions incorrect. On balance, given the evidence in this case—including the appellant's detailed confession in which he agrees that the victim was intoxicated to the point of being unconscious—we conclude that any error did not have a substantial influence on the findings. *See United States v. Gibson*, 58 M.J. 1, 7 (C.A.A.F. 2003).

*Unlawful Command Influence*

The appellant next alleges, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), that apparent unlawful command influence so permeated the Air Force at the time of his trial that it was impossible for him to receive a fair trial or clemency consideration. The appellant asked the military judge to dismiss all charges on this same basis. The military judge denied the motion.

According to the appellant, it was impossible for him to receive a fair trial or post-trial processing due to the cumulative effect of comments made by the President of the United States, the Chief of Staff of the Air Force, the former and current Secretaries of Defense, and other senior military leaders.

Article 37(a), UCMJ, 10 U.S.C. § 837(a), states in relevant part: "No person subject to this chapter may attempt to coerce or . . . influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case . . . ." The mere appearance of unlawful command influence may be "as devastating to the military justice system as the actual manipulation of any given trial." *United States v. Ayers*, 54 M.J. 85, 94–95 (C.A.A.F. 2000) (quoting *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991)).

The burden of raising the issue of unlawful command influence rests with trial defense counsel. *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999). The defense must: (1) "show facts which, if true, constitute unlawful command influence," and (2) show "the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *Id.* To meet the threshold for raising this issue, trial defense counsel is required to present "some evidence" of unlawful command influence. *Id.* (citation omitted). If the defense meets that burden to raise the issue, the burden shifts to the government, who must: "(1) disprove the predicate facts on which the allegation of unlawful command influence is based; (2) persuade the military judge that the facts do not constitute unlawful command influence; or (3) prove at trial that the unlawful command influence will not affect the proceedings," and "whichever tactic the Government chooses, the quantum of proof is beyond a reasonable doubt." *United States v. Simpson*, 58 M.J. 368, 373 (C.A.A.F. 2003) (internal quotation marks omitted).

Where, as here, the issue is litigated on the record at trial, the military judge's findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that this court reviews de novo. *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999).

The appellant's argument at trial was focused on various comments by officials including the President of the United States, two Secretaries of Defense, and other Air Force senior leaders. Notably, none of the comments at issue were made by anyone directly involved in the appellant's court-martial. The military judge ruled that the defense had failed to meet its burden to establish facts which, if true, amounted to unlawful command influence. Instead, he treated the issue as one to be handled during the voir dire process. The military judge further noted that he would apply the actual and implied bias standards and the liberal grant mandate when ruling on challenges for cause.

On appeal, the appellant does not offer any new argument or analysis concerning the military judge's findings of fact, including the finding beyond a reasonable doubt that there was no impact from any of the statements made by the senior officials. Instead, the appellant invites us to consider the attachments to the trial-level motion.

We reviewed the entire record, including the comments made by the senior officials and the members' responses during the voir dire process. The military judge's findings of fact are amply supported by the record and are not clearly erroneous. We need not reach the question of whether the defense met its initial burden of production of evidence, as the military judge found beyond a reasonable doubt—and we agree—that the statements at issue had no impact on the appellant's trial. An "objective, disinterested, reasonable member of the public, fully informed of all the facts and circumstances," would not "harbor a significant doubt about the fairness of the appellant's court-martial proceeding." *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006).

*Sentence Severity*

Also pursuant to *Grostefon*, the appellant argues that the dishonorable discharge is inappropriately severe. We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (2006); *see also United States v. Baier*, 60 M.J. 382, 383–84 (2005). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and determine[], on the basis of the entire record, should be approved." Article 66(c), UCMJ. We assess sentence appropriateness by considering the appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial. *See United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982); *United States v. Bare*, 63 M.J. 707, 714 (A.F. Ct. Crim. App. 2006), *aff'd*, 65 M.J. 35 (2007).

While we have a great deal of discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *See United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999); *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A. 1988). The maximum imposable sentence was a dishonorable discharge, confinement for 37 years, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. The approved sentence of a dishonorable discharge, confinement for three months, forfeiture of all pay and allowance, reduction to E-1, and a reprimand was clearly within the discretion of the convening authority.

The appellant argues that the dishonorable discharge is inappropriately severe because his "career reflects his dedication and quality of service" and because his duties as an Airman advanced the mission. We have given individualized consideration to this appellant and the evidence in the record. We have no difficulty concluding that a sentence which includes a dishonorable discharge is not inappropriate for this appellant who sexually assaulted a fellow Airman's visiting family member while that family member was incapacitated and unable to defend herself.

*Post-Trial Processing*

The appellant next argues that the 148-day period between the conclusion of trial and the convening authority's action warrants the "modest relief" of substituting a bad-conduct discharge for the dishonorable discharge. Under *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), there is a presumption of unreasonable delay when the convening authority does not take action within 120 days of the conclusion of the trial.

We review de novo an appellant's claim that he has been denied the due process right to a speedy post-trial review and appeal. *Moreno*, 63 M.J. at 135. Because the 28-day delay in this case is facially unreasonable, *id*. at 142, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135. If we are able to conclude directly that any error was harmless beyond a reasonable doubt, we do not need to engage in a separate analysis of each factor. *See United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F. 2006).

The appellant does not argue that he has been personally prejudiced by the delay. *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration, (2) anxiety and concern, and (3) impairment of ability to present a defense at a rehearing. *Moreno* at 138–39. None are present or alleged in this case. While we agree that *Moreno* violations are unacceptable, we find beyond a reasonable doubt that the appellant was not harmed by the 28-day delay and is thus not entitled to relief under *Moreno*.

However, that does not end the inquiry, as we may grant sentence relief under Article 66(c), UCMJ, 10 U.S.C. § 866(c), even when we find no prejudice in unreasonable post-trial delays. *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002); *see also United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006) (finding delays were "such that tolerating them would adversely affect the public's perception of the fairness and integrity of the military justice system"). However, "[a]ppellate relief under Article 66(c) should be viewed as the last recourse to vindicate, where appropriate, an appellant's right to timely . . . review." *Tardif*, 57 M.J. at 225.

We reviewed the entire record, to include the court reporter's chronology, and considered the manner in which the record was prepared and the attendant legal office processing (including efforts to ensure the victim was able to exercise her right to make a statement). While we agree that post-trial processing delays should be avoided, we are not persuaded that *Tardif* relief is warranted in this case.

*Conclusion*

The finding of guilty to Specification 6 of the Charge is set aside and that specification is dismissed. The remaining findings of guilt and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings, as modified, and the sentence are **AFFIRMED**.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court