# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Marc L. MIERES
### Maritime Enforcement Specialist Second Class (E-5), U.S. Coast Guard

### CGCMG 0393
### Docket No. 1491

### 10 June 2024

General court-martial sentence adjudged on 15 April 2022.

| | |
|---|---|
| Military Judge: | CAPT Ted R. Fowles, USCG |
| Appellate Defense Counsel: | LT Schuyler B. Millham, USCG |
| | LCDR Thadeus J. Pope, USCG |
| Appellate Government Counsel: | LT Elizabeth M. Ulan, USCG |
| | LT Christopher J. Hamersky, USCG |
| | John P. Nolan, Esq. |

## BEFORE
## McCLELLAND, BRUBAKER & TASIKAS
### Appellate Military Judges

BRUBAKER, Judge:

A general court-martial of members with enlisted representation convicted Appellant, contrary to his pleas, of one specification of failure to obey a lawful order and one specification of assault consummated by a battery, in violation of Articles 92 and 128, Uniform Code of Military Justice (UCMJ). Appellant was sentenced to reduction to E-3, restriction for 15 days, and a letter of reprimand. Judgment was entered accordingly.

Before us, Appellant raises four assignments of error (AOEs), paraphrased as follows:

I. The convening authorities violated Appellant's equal protection rights by soliciting, receiving, and presumptively considering panel members' race and gender in selecting who would serve on the court-martial;

II. The Government violated Appellant's due process right to timely appellate review;

III.    The evidence was legally insufficient to support the conviction for violating a lawful order; and

IV.    The military judge abused his discretion in denying Appellant's challenge for cause of the senior panel member.[1]

We conclude there is legally sufficient evidence to support Appellant's conviction for violating a lawful order, *see United States v. Mays*, 83 M.J. 277, 279 (C.A.A.F. 2023), and that the military judge did not abuse his discretion when he denied Appellant's challenge for cause, *see United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015). We discuss Appellant's remaining contentions but conclude there is no prejudicial error and affirm.

**Jurisdiction**

Both parties agree we have jurisdiction over Appellant's case. We agree as well, but because we have not had occasion to address jurisdiction under the procedural circumstances of this case, we take the opportunity to do so now.

We have "a special obligation" to satisfy ourselves of our own jurisdiction. *Loving v. United States*, 62 M.J. 235, 239 (C.A.A.F. 2005). "The question of jurisdiction is a question of law that we review de novo." *United States v. Begani*, 81 M.J. 273, 276 (C.A.A.F. 2021). As an Article I court, our jurisdiction is closely circumscribed by statute. *United States v. Kelly*, 77 M.J. 404, 406 (C.A.A.F. 2018); *see also United States v. Denedo*, 556 U.S. 904, 912 (2009) (recognizing that the rule that Congress defines the subject-matter jurisdiction of federal courts "applies with added force to Article I tribunals . . . .").

At the time Appellant's court-martial concluded and judgment was entered, his sentence did not, under the statutes then in place, meet the jurisdictional requirements for a direct appeal to the Court of Criminal Appeals (CCA). *See* Art. 66(b), UCMJ (2016). Instead, an accused with a "subjurisdictional" sentence was entitled to a limited review by a judge advocate under Article 65, UCMJ, then, if he submitted a timely application, fuller review by the Judge Advocate General (TJAG). Arts. 65, 69, UCMJ (2016). To be timely, the application had to be submitted to

---

[1] Appellant personally raised AOEs III and IV pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

TJAG within one year of the Article 65 review, although TJAG could extend that up to three years from completion of Article 65 review for good cause shown. Art. 69(b), UCMJ (2016). The CCA could then obtain jurisdiction over the case if either TJAG sent the case to it or the accused applied for, and the Court granted, judicial review. Art. 69(d), UCMJ (2016).

On 16 November 2022, Appellant was notified that review under Article 65, UCMJ, was complete and that he had the right to seek review by TJAG within one year of the notification. Well before that period expired—23 December 2022—Congress amended Articles 66 and 69, UCMJ.[2] As amended, Article 66 expanded the CCA's jurisdiction to any judgment of a court-martial, irrespective of sentence, that includes a finding of guilty. Art. 66(b)(1)(A) (2022). However, unless entitled to automatic review based on severity of the sentence, an accused must submit a timely appeal, which the statute defines as the later of: (1) 90 days from when the accused is provided notice of appellate rights under Article 65(c); or (2) the date set by the CCA by rule or order. Art. 66(c)(1), UCMJ (2022).

On 5 April 2023, TJAG provided Appellant notice that he had the right to file an appeal with the CCA under the new Article 66. *See* Article 65(c)(1), UCMJ (2022). Less than 90 days later, Appellant filed a notice of appeal with this Court.

The jurisdictional requirement of a timely filed appeal is, therefore, met. Art. 66(c)(1), UCMJ (2022). The remaining question, then, is whether TJAG was correct as a matter of law when he advised Appellant that the new Article 66 applied to him. Reviewing de novo, *Begani*, 81 M.J. at 276, we conclude he was. Although we recognize that not all Judge Advocates General and not all litigants across the armed forces have embraced this interpretation, we join two of our sister CCAs in reaching this conclusion. *United States v. Hirst*, __ M.J. __, No. NMCCA 202300208, 2024 WL 1521549, at *12 (N-M. Ct. Crim. App. Apr. 9, 2024); Order at 1, *United States v. Cooley*, ACM No. 40376 (A.F. Ct. Crim. App. 7 Jul 23) (unpub.).

---

[2] National Defense Authorization Act for Fiscal Year 2023 (FY23 NDAA), Pub. L. No. 117-263, § 544, 136 Stat. 2395 (Dec. 23, 2022).

Section 544 of the National Defense Authorization Act (NDAA) amending Articles 66 and 69—titled "JURISDICTION OF COURTS OF CRIMINAL APPEALS"—provides:

> (d) Applicability.—The amendments made by this section shall not apply to—
>     (1) any matter that was submitted before the date of the enactment of this Act to a [CCA]; or
>     (2) any matter that was submitted before the date of the enactment of this Act to a Judge Advocate General under [Article 69, UCMJ].

136 Stat. 2395 § 544(d).

As can be seen, the provision addressing applicability of the expanded Article 66 in fact only states when it does *not* apply. Of course, one can only submit matters to a CCA or Judge Advocate General in a case where a court-martial judgment has already occurred, so this provision clearly envisions applicability over judgments that occurred prior to its enactment— just not those pre-enactment cases where matters have already been submitted to a CCA or Judge Advocate General. *Accord*, Order at 6, 8–9, *Cooley*, ACM No. 40376 (citing the canon of statutory construction, *expressio unius est exclusio alterius*). Had Congress intended otherwise— such as that the amendments apply only to judgments entered on or after its enactment date—we can expect it would have simply said so. *See, e.g.*, 136 Stat. 2395 § 5542(c) ("[T]he amendments made by this division shall not apply to any case in which charges are referred to trial by court-martial before the effective date of such amendments."). Or it could have remained silent on applicability, which may have had the same effect. Order at 6–7, *Cooley*, ACM No. 40376. Instead, Congress explicitly chose to limit pre-enactment applicability only when the accused, prior to enactment, submitted matters under the old scheme either to the CCA or to TJAG.

At the same time, nothing in this provision alters Article 76, UCMJ. It provides that "the proceedings, findings, and sentences of courts-martial as approved, reviewed, or affirmed as required by [the UCMJ] . . . are final and conclusive." Art. 76, UCMJ (2022). Based on this, we may add the qualifier that the amended Article 66 applies to *pending* pre-enactment cases—that is, judgments entered prior to 23 December 2022 that were not final because they had not yet received all review required under the UCMJ—with the two exceptions already noted.

When the amended Article 66 was enacted, Appellant's case was pending: he was still within his one-year window to apply for review by TJAG. We pause, however, to acknowledge a counterargument: that upon review under Article 65, Appellant was entitled to no further review and his case was therefore final. *See United States v. Parino-Ramcharan*, 84 M.J. 138 (C.A.A.F. 2023) (granting petition for review). This argument finds support in the literal language of Article 69(c): when defining the scope of TJAG's review under Article 69, it states that in a case reviewed under Article 65(b), UCMJ, TJAG may set aside the findings or sentence, in whole or in part. Art. 69(c)(1)(A), UCMJ (2016). Because Article 65(b) talks about cases eligible for direct appeal to the CCA, goes the argument, Article 69 therefore does not permit TJAG review of cases *not* eligible for direct appeal. Thus, once review under Article 65(d) of such a case has been completed, an accused has no further recourse either to TJAG or to the CCA.[3]

We join our sister court in rejecting this argument. *Hirst*, 2024 WL 1521549, at *4–5. Although it has a superficial, literalist appeal, a closer look reveals its flaws. First, when one turns back to Article 65(b), one quickly sees that cases are not "reviewed under" that provision. Article 65(b) addresses only TJAG's responsibility to *forward* records of trial for cases eligible for review by the CCA. No review is happening in Article 65(b), so Article 69(c)'s reference to cases "reviewed under" Article 65(c) is, right off the bat, a non sequitur.

Second, there is a provision in Article 65 where review *is* happening: Article 65(*d*), which is even titled "Review by Judge Advocate General." This provision, unlike Article 65(b), addresses review of cases, both those that are *not* eligible for direct appeal to the CCA, Art. 65(d)(2), as well as those that are, Art. 65(d)(3). In other words, even under the most fundamental reading of Article 65, cases are "reviewed under" Article 65(d), not (b).

Finally, a constrained, literalist reading would seem to turn the NDAA's provision for the applicability of the amended Article 66 on its head. The applicability provision is, on its face, broad. As discussed, it plainly envisions applying the amended Article 66's expanded access to the CCA to judgments occurring prior to its enactment with only two exceptions: matters already

---

[3] *See,* Appellee's Brief at 11-12, *United States v. Parino-Ramcharan*, available at: https://www.armfor.uscourts.gov/newcaaf/briefs/2023Term/ParinoRamcharan230245AppelleeBrief.pdf, last visited 16 Apr 24.

submitted to the CCA and matters already submitted to TJAG under Article 69. 136 Stat. 2395 § 544(d). Yet, if the counterargument were correct, an accused could submit matters to TJAG and the CCA only if he or she *already had* the right to appeal to the CCA. It makes no sense that Congress's limits on the applicability of an amendment expanding CCA jurisdiction would apply only to cases where there was already jurisdiction. A plain reading leads us to the conclusion that Congress intended to offer expanded jurisdiction to prior judgments, like Appellant's, where there had been no right of appeal to the CCA, as long as matters had not yet been submitted for review under the old statutory scheme.

Accordingly, we conclude that reading Article 69(c), UCMJ (2016), to limit TJAG's scope of review to *nothing* for cases not already eligible for appeal to the CCA is absurd and plainly contrary to Congress's intent as expressed in the UCMJ itself. We thus join our sister court in concluding that Article 69(c)(1)(A)'s reference to Article 65(*b*) is a scrivener's error and instead was plainly meant to reference Article 65(*d*). *Hirst*, 2024 WL 1521549, at *2–3.

At the time the amended Article 66 was enacted, Appellant's case was, therefore, pending. Because no matters were submitted in his case prior to enactment, either to this Court or to TJAG, the amended Article 66 applies to his case, and we have jurisdiction. Art. 66, UCMJ (2022).

**Panel Selection Process**

Appellant asserts his equal protection rights were violated when the convening authorities who initially selected, then amended, the panel received and presumptively considered information of prospective members' race and gender. Because Appellant did not raise this claim at trial, he forfeited it. R.C.M. 905(e)(1); *United States v. King*, 83 M.J. 115, 120–21 (C.A.A.F. 2023); *United States v. Shafran*, 84 M.J. 548, 567 (C.G. Ct. Crim. App. 2024). He therefore is entitled to relief only if he can establish there was error that was plain or obvious. *United States v. Humphries*, 71 M.J. 209, 214 (C.A.A.F. 2012). "[W]here the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration.'" *United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008) (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)).

At the time of Appellant's court-martial, case law permitted convening authorities to use race to select a panel when it was "in favor of, not against, an accused." *United States v. Crawford*, 15 C.M.A. 31, 35 C.M.R. 3 (1964). Further, military appellate courts did "not presume improper motives from inclusion of racial . . . identifiers on lists of nominees for court-martial duty." *United States v. Loving*, 41 M.J. 213, 285 (C.A.A.F. 1994). Recently, however, the United States Court of Appeals for the Armed Forces overturned *Crawford* and held that when "an accused makes a prima facie showing that race played a role in the panel selection process at his court-martial, a presumption will arise that the panel was not properly constituted." *United States v. Jeter*, 84 M.J. 68, 70 (C.A.A.F. 2023). The court concluded Jeter made a prima facie showing based the circumstances of that case, which included "the racial identifier in the questionnaires, other evidence before the court of criminal appeals, and importantly, the command's understandable belief that the *Crawford* case—which not only authorized but essentially encouraged the consideration of race—was still good law." *Id.* at 74. Because the Government had not rebutted an inference "that Appellant's constitutional right to equal protection under the law was violated when the acting convening authority presumptively used a race-conscious selection process for panel members," it set aside Jeter's findings and sentence. *Id.*

Appellant asserts he, too, is entitled to relief because he has made an unrebutted prima facie showing that race—as well as gender, he adds—played a role in the panel selection process at his court-martial. We disagree. Appellant, unlike Jeter, faces the higher burden of demonstrating plain or obvious error. *See Shafran*, 84 M.J. at 567. This he fails to do.

As we noted in *Shafran*, *Jeter* addressed racial, not gender, identifiers in questionnaires submitted for the convening authority's consideration. "A plain error setting is not the vehicle for us to extend *Jeter*'s holding, and it is not plain or obvious that the use of gender identifiers in materials available to the convening authority establishes a presumed equal protection violation." *Id.* at 568.

Moving to racial identifiers, to support his claim of improper panel selection, Appellant points to an appellate exhibit containing completed members' questionnaires. At the top of each

questionnaire is a standard disclosure that it "is submitted to you under Rule for Courts-Martial 912" and asking that it be completed and returned as soon as possible. It offered, "Instead of writing in your assignment history, you may include your [Coast Guard] Member Information Summary Sheet. *However, it is not required.*" *See, e.g.,* App. Ex. 81 at 1. Apparently, all opted to include one; following each questionnaire is such a personnel information summary sheet. Along with other data, these system-generated sheets contain fields for race and ethnicity that are in most cases, but not all, filled out.

This does not show plain or obvious error. First, unlike *Jeter*, and even unlike *Shafran*, there is nothing in the record to establish that these data sheets were, in fact, solicited by or provided to the convening authorities. *See* R.C.M. 912(a)(1) ("Before trial, *trial counsel* may, and shall upon request of defense counsel, submit to each member written questions . . . ."). Second, beyond the bare fact of racial identifiers on material that may or may not have been available to the convening authorities, in this case, there is none of the "other evidence before the court of criminal appeals" that factored into the conclusion that Jeter had established a prima facie case. *Jeter*, 84 M.J. at 74. The evidence there included a Black accused facing an all-White panel; an original panel that included two Black members before an amendment removed and replaced them with White members; and three other courts-martial convened by the same convening authority with Black accuseds before all-White panel members. *Id.* at 70, 73–74.

Given the evidence before us in this case, it is not plain or obvious that, under *Jeter*, race played an impermissible role in Appellant's panel selection process. Accordingly, we decline to grant relief.

## Post-Trial Delay

Appellant asserts he is entitled to relief for unreasonable post-trial delay, noting that it took the Government 452 days from the date of sentencing to docket the case with a complete record of trial, including a verbatim transcript. Under the circumstances of this case, we disagree.

Servicemembers "have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006). We review whether Appellant was denied this right de novo. *Id*. This generally involves a three-tiered analysis. *Id.*

We first determine whether the post-trial delay is facially unreasonable. *Id.* at 136. Appellant argues it was presumptively unreasonable under specific time standards established in *Moreno*, 63 M.J. at 142, and *United States v. Tucker*, 82 M.J. 553, 570 (C.G. Ct. Crim. App. 2022). But as we recently held, the *Moreno/Tucker* time standards are inapt to non-automatic appeals under Article 66(b)(1), UCMJ (2022), such as this one, which are procedurally different from automatic appeals and did not exist at the time of *Moreno*. *United States v. Chock*, 84 M.J. 578, 580 (C.G. Ct. Crim. App. 2024). In the absence of creating modified time standards—which we declined to do in *Chock*, *id*., and again decline to do here—we revert to conducting "a case-by-case analysis to determine if a given delay is facially unreasonable." *Moreno*, 63 M.J. at 136.

If we determine delay to be facially unreasonable, we next conduct a full analysis of whether a due process violation occurred by weighing the four *Barker* factors: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. *Moreno*, 63 M.J. at 135 (citing *Barker v. Wingo,* 407 U.S. 514, 530 (1972)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136.

Finally, if we conclude there was a due process violation, we must grant relief unless we are convinced beyond a reasonable doubt that the error is harmless. *United States v. Toohey*, 63 M.J. 353, 363 (C.A.A.F. 2006).

We may, however, dispose of a claimed due process violation by "assuming error and proceeding directly to the conclusion that any error was harmless." *United States v. Allison*, 63 M.J. 365, 370-71 (C.A.A.F. 2006). We do so here. Appellant concedes he suffered no actual prejudice. We agree. There is nothing in the record to indicate he was harmed in any way by the time it took to notify him of his newly created right to appeal directly to this Court and to docket a complete record with this Court. Considering the totality of the circumstances, *id.* at 371, we

conclude that even if there was a due process violation, it was harmless beyond a reasonable doubt.

We turn now to whether we should grant relief under Article 66(d)(2), UCMJ, and *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). Even in the absence of a due process violation, this Court may grant appropriate relief if an appellant demonstrates "excessive delay in the processing of the court-martial after the judgment was entered into the record . . . ." Art. 66(d)(2), UCMJ.

We decline to do so. There is a complete lack of prejudice here, legally cognizable or otherwise. Any relief would be a pure windfall.

We also do not view the delay as egregious. Although Appellant notes that 452 days lapsed from when he was sentenced to when the Government provided this Court a complete record of trial with transcript, more than half that time—252 days—was before Congress had even created the right for him to appeal to this Court. That can hardly be attributed to the Government. Once Congress did amend Article 66, 109 days lapsed until the Government provided Appellant a notice of right to appeal. Under the circumstances, we do not find this unreasonable. Article 65(c)(1), UCMJ, imposes a non-discretionary obligation on TJAG to provide notice of the right to file an appeal under Article 66(b)(1), but it does not impose a specific timeline for doing so. Although 109 days would, under ordinary circumstances, be a long time to perform such a ministerial function, the circumstances were complicated here by the uncertainty and debate among military justice policymakers across the armed forces about whether the new Article 66(b)(1) applied to servicemembers like Appellant.

We also conclude that, far from being dilatory, the Government's actions demonstrate their good faith. The Government initially took the position that under the amended Article 66, UCMJ, Appellant's review rights were exhausted once he received review under Article 65, UCMJ. In the spring of 2023, the Defense bar requested that the Government reconsider its position. It did—without the need for judicial intervention—and shortly thereafter began sending notices of rights to appeal in cases like Appellant's. As stated, we ultimately agree with the

Government's revised position, but we acknowledge there are good faith positions to the contrary. We find nothing dilatory about the Government's actions.

Finally, Appellant asserts that the time the Government took to produce a verbatim transcript was unreasonable. This Court, upon receiving Appellant's notice of appeal, ordered the Government to produce a verbatim transcript within 45 days. Citing difficulties encountered in having a contractor produce the transcript, including transcribers contracting COVID, the Government requested, and over Appellant's opposition we granted, extensions. Ultimately, the Government produced a 2,141-page verbatim transcript a total of 92 days after we ordered one.

This may not be the model of efficiency, but nor is it egregious. We again emphasize that Appellant, neither in confinement nor awaiting a discharge certificate, suffered no harm from the time it took to produce a transcript. Under the circumstances, we decline to invoke our discretionary authority to grant sentence relief.

## Decision

We determine that the findings and sentence are correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Chief Judge McCLELLAND and Judge TASIKAS concur.



For the Court,

Sarah P. Valdes
Clerk of the Court