# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, D.C. KING, T.H. CAMPBELL**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**NHUBU C. CHIKAKA**
**STAFF SERGEANT (E-6), U.S. MARINE CORPS**

**NMCCA 201400251**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 14 March 2014.
**Military Judge:** LtCol D.M. Jones, USMC.
**Convening Authority:** Commanding General, Marine Corps Recruit Depot/Eastern Recruiting Region, Parris Island, NC.
**Staff Judge Advocate's Recommendation:** LtCol K.M. Navin, USMC.
**For Appellant:** Maj Michael Magee, USMC.
**For Appellee:** Maj Suzanne Dempsey, USMC; Capt Matthew Harris, USMC.

**12 April 2016**

---------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

KING, Senior Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of an attempt as a lesser included offense of abusive sexual contact, nine general order violations, wrongful sexual contact, abusive sexual contact, four obstructions of justice, indecent language, and adultery, in violation of Articles 80, 92, 120, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 892, 920, and 934 (2007 and 2012).[1] The appellant was acquitted of another abusive sexual contact and the military judge dismissed a

---

[1] The specifications alleged offenses under both 2007 and 2012 versions of Article 120, UCMJ, 10 U.S.C. § 920.

general order violation specification for its failure to state an offense. The members sentenced the appellant to total forfeitures, reduction to pay grade E-1, confinement for 12 years, and a dishonorable discharge. The convening authority (CA) approved the sentence as adjudged.

Initially, the appellant raised seven assignments of error (AOEs), including that he was deprived of his right to submit clemency matters for the CA's consideration. Consequently, on 24 June 2015, we set aside the original CA's action and returned the record of trial to afford the appellant an opportunity to submit clemency matters. After the appellant did so, the CA disapproved confinement in excess of 10 years as a "matter of clemency" and approved the remaining sentence as adjudged. The case is now before us for completion of review, wherein the appellant sets forth 13 AOEs,[2] including the following: the obstruction of justice specifications failed to state an offense; legal and factual insufficiency; unreasonable multiplication of charges; cumulative error, and; the denial of speedy post-trial review.

After carefully considering the record of trial, parties' pleadings, and oral argument on AOEs 1 and 3, we conclude that Specifications 1, 5, and 6 under Charge III represent an unreasonable multiplication of charges and that the appellant was prejudiced during sentencing by the erroneous admission of evidence. We take corrective action in our decretal paragraph. With that action, the remaining findings and reassessed sentence are correct in law and fact, and no error materially prejudicial to the appellant's substantial rights remains. Arts. 59(a) and 66(c), UCMJ.

**Background**

The appellant was a married Marine recruiter in the Sixth Marine Corps District (6MCD) at Recruiting Substation (RS) Douglasville, GA, where his duties included visiting high schools to recruit young men and women into the United States Marine Corps. His duties also included assisting enlisted "poolees" in matriculating into the Marine Corps before reporting to recruit training, including providing them transportation to and from Marine events (such as physical training, social events, etc.), meeting with them in his official office spaces, and otherwise assisting them to prepare for their induction.[3]

While serving in this capacity, the appellant met and interacted with the four female victims in this case, all of whom were over the age of 16 and in high school at the time. Shortly after these students expressed interest in joining the Marine Corps, the appellant began engaging in unprofessional behavior with and/or toward them. The misconduct included his sending thousands of inappropriate electronic communications, engaging in unwanted sexual activity with two of the four, and plying a third with alcohol and commencing an adulterous relationship with her. One of the victims' boyfriends, himself a poolee, confronted the appellant at the recruiting office, where the appellant apologized for his misconduct. While committing his misconduct, and even after the crimes were reported, the appellant encouraged the victims to refrain from disclosing his behavior to others. Additional facts necessary to resolve the AOEs are included below.

---

[2] *See* Appendix A.

[3] At trial, the victims were referred to as "poolees" or members of the "Delayed Entry Program" (DEP).

**Discussion**

**1. Failure to State an Offense**

The Government charged the appellant with four obstructions of justice in violation of Article 134, UCMJ.[4] The elements of obstruction are: (1) that the accused wrongfully did a certain act; (2) that the accused did so in the case of a certain person against whom the accused had reason to believe there were or would be criminal proceedings pending; (3) that the act was done with the intent to influence, impede, or otherwise obstruct the due administration of justice; and (4) that, under the circumstances, the conduct of the accused was to the prejudice of good order and disciple in the armed forces or of a nature to bring discredit upon the armed forces. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 96.

Although the defense lodged no objection at trial, the appellant now claims that the obstruction specifications fail to state an offense. The Government concedes that the specifications omitted language contained in the third element listed above, but contends that the specifications are nonetheless sufficient. We agree with the Government.

Where defects in a specification are raised for the first time on appeal, we will review the defect for plain error. *United States v. Humphries*, 71 M.J. 209, 213 (C.A.A.F. 2012). Under a plain error analysis, the appellant must demonstrate that: (1) there was error; (2) the error was plain or obvious; and, (3) the error materially prejudiced a substantial right of the accused. *United States v. Tunstall*, 72 M.J. 191, 193-94 (C.A.A.F. 2013). A charge and specification "'[are] sufficient if [they], first, contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and, second, enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Norwood*, 71 M.J. 204, 206 (C.A.A.F. 2012) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)) (alteration in original). The specification may allege the elements "expressly or by necessary implication." RULE FOR COURTS-MARTIAL 307(c)(3), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.); *United States v. Fosler*, 70 M.J. 225, 230 (C.A.A.F. 2011) (when a specification does not expressly allege an element of the intended offense, appellate courts must determine whether the element was necessarily implied); *United States v. Russell*, 47 M.J. 412, 413 (C.A.A.F. 1998) ("A specification is sufficient so long as [the elements] may be found by reasonable construction of other language in the challenged specification.") (citations and internal quotation marks omitted) (alteration in original). The question of whether a specification states an offense is a question of law, which we review *de novo*. *United States v. Ballan*, 71 M.J. 28, 33 (C.A.A.F. 2012).

In this instance, the specifications omit the words, "with the intent to influence, impede, or otherwise obstruct the due administration of justice." Instead, and as suggested by the model specification found in MCM, Part IV, ¶ 96(f), the specifications allege that the appellant "wrongfully endeavor[ed] to influence the actions of [one of the victims], a witness in the case of [the appellant], by discouraging her communication of information relating to violations of the [U.C.M.J.] to a person authorized to conduct or engage in the investigation[.]"

---

[4] These offenses were alleged in Specifications 1, 3, 5, and 6 under Charge III.

3

The phrase "wrongfully endeavored to influence the actions of . . . a witness" necessarily implied and provided sufficient notice to the appellant of the third element and protected him from future prosecutions for the same offense. We thus find no error.

## 2. Legal and Factual Sufficiency of Obstructing Justice Convictions

The appellant claims that the four charges of obstructing justice are legally and factually insufficient since the prosecution "failed to prove [that he] had reason to believe there would be criminal proceedings pending or that he had the specific intent required for the offense[] of obstructing justice."[5]

In accordance with Article 66(c), U.C.M.J., we review questions of legal and factual sufficiency *de novo. United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (internal quotation marks and citations omitted). In weighing questions of legal sufficiency, the court is "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

Each of the four obstruction specifications alleged a different victim as the "witness." The prosecution established that the appellant sent several inappropriate texts to each victim. BH testified that she did not keep any of the incriminating texts because "every time that he would text me he would say, 'Make sure that you delete all of these messages. If anybody ever sees them, then I'm going to get in trouble and you're going [to] get in trouble. And you won't be able to leave for boot camp, and I'm going to be fired.'"[6] Similarly, BJ testified that the appellant told her "to delete [the messages] because we would both get in trouble. He would get in trouble, lose his career, lose his family, lose his kids; I wouldn't go to boot camp."[7] Finally, LB testified that "[the appellant] told me that I should delete them because it could ruin his career and maybe affect him getting custody of his children, things of that nature."[8] All of these requests to delete texts occurred prior to any report of misconduct.

On or about 8 August 2012, after the misconduct was reported, the appellant sent a single text message to these three victims:

---

[5] Appellant's Brief of 5 Jan 2015 at 32.

[6] Record at 419.

[7] *Id.* at 478.

[8] *Id.* at 548.

4

[BJ, BH, LB] . . . I did not know I was offending any of you and am sorry whole heartedly please forgive me and allow me to remain a Marine something I have been doing for 13yrs something that I love to do. . . . I am asking as a friend to talk to you all so I maybe [sic] clear on what I am doing that I did not know was offending you so I can stop.  PLEASE I do not want to loose [sic] my kids or my career or any of the friendships we have formed.  I am just praying and hoping this is all a misunderstanding.  Please txt or call me first thing in the morning.[9]

There is sufficient evidence in this case to reasonably conclude that the appellant realized that he had committed a UCMJ offense which had been reported before he sent the 8 August 2012 text message.  We have little difficulty concluding that the appellant then had reason to believe his command would pursue investigative and follow-on criminal proceedings, and that his text message was an effort to implore the victims to recant or minimize his misconduct.  Thus, the members could reasonably infer that the appellant acted with the intent to influence, impede, or otherwise obstruct the due administration of justice.

Our analysis of Specification 1, 5, and 6 of Charge III does not end there because, while the Government concedes those specifications are "based on a single text message" to BJ, BH, and LP, each specification alleges a time period beginning at least a month before the 8 August 2012 text.

An accused can obstruct justice even if an investigation is not already underway.  *United States v. Finsel*, 36 M.J. 441, 444 (C.M.A. 1993).  The law requires only that, at the time of his act, the accused had reason to believe there were or would be criminal proceedings pending against him.  *United States v. Athey*, 34 M.J. 44, 48 (C.M.A. 1992).  Thus, obstruction of justice may occur absent formal charges, prior to any formal proceeding, *United States v. Jones*, 20 M.J. 38, 40 (C.M.A. 1985),  or even when the accused only "believed that some law enforcement official of the military . . . *would be* investigating his actions" and elicited the aid of others to conceal his crime, *Athey*, 34 M.J. at 48.  In contrast, merely concealing one's own misconduct is not an obstruction of justice.  *United States v. Lennette*, 41 M.J. 488, 490 (C.A.A.F. 1995).  Determining whether an act is undertaken to avoid detection or in an effort to corrupt the processes of justice is determined "'on a case-by-case basis, considering the facts and circumstances surrounding the alleged obstruction and the time of its occurrence with respect to the administration of justice.'"  *Id.* (quoting *Finsel*, 36 M.J. at 443).

We agree with the appellant that the evidence is insufficient to sustain convictions for obstructing justice at times or by means other than the single text message.  Evidence the appellant asked the victims to delete texts prior to his misconduct being reported is insufficient to establish that the appellant did any more than attempt to keep his misconduct concealed.  *See Lennette,* 41 M.J. at 490 (mere concealment of one's misconduct is not obstruction of justice); *Athey,* 34 M.J. at 49 (mere realization that one's misconduct, if revealed, might result in criminal prosecution is not enough to give one reason to believe there *would be* criminal proceedings pending).  To the extent that the specifications allege the appellant obstructed justice by asking

---

[9] Prosecution Exhibit 8.

the victims to delete texts prior to any reporting, we except and dismiss the unproven language about dates other than 8 August 2012.[10]

The remaining obstruction specification involves the fourth victim, LW. After the appellant first met LW, he quickly began making inappropriate phone calls to her, during which he asked about her sexual preferences. During the first of these calls, made prior to any report of misconduct, the appellant warned LW that she "should not tell anybody because he could lose his career and his children."[11] The appellant and LW then commenced a sexual relationship. After the appellant's misconduct was reported, LW called the appellant. He told her that the other "three girls [were] lying about him," and asked LW to "testify for him[,]" but LW refused, concerned that she "was in the wrong" as well.[12] She eventually testified against the appellant at trial:

Q: What were you worried all about people finding?
A: Our phone records and us talking.

Q: Did he ever tell you what would happen if someone found out about you guys having sex or the phone records?
A: Yes. He was always telling me that he would lose his kids and lose his career.

Q: What did he tell you to do so that that didn't happen?
A: I just kept quiet.

Q: He told you to keep quiet?
A: Yes. Just don't tell anybody.

Q: And did you ever tell anyone?
A: No.

Q: What did he say when you explained to him how nervous you were about your phone records and all the communication and sex that you guys had?
A: He was like "[i]t's okay" and we hung up.

Q: That was the end of the conversation?
A: Yes.

Q: Once you refused to testify?
A: Yes.[13]

---

[10] For the same reason, we also except and dismiss the words "on divers occasions" from Charge III, Specification 1.

[11] Record at 588.

[12] *Id.* at 608.

[13] *Id.* at 608-09.

6

This evidence, when viewed in the light most favorable to the prosecution, was sufficient to allow a reasonable factfinder to find beyond a reasonable doubt that the appellant asked LW to not "tell anyone" after he knew his misconduct had been reported—hence, after he had reason to believe there would be an investigation into his activities with LW—and that his request was with the intent to impede that investigation.

After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt on all four obstruction specifications as modified.

### 3. Unreasonable Multiplication of Charges

Next, the appellant claims that the charges against him were unreasonably multiplied since he was convicted of 16 specifications involving misconduct with four different victims.

"[T]he prohibition against unreasonable multiplication of charges has long provided courts-martial and reviewing authorities with a traditional legal standard -- reasonableness -- to address the consequences of an abuse of prosecutorial discretion in the context of the unique aspects of the military justice system." *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001). R.C.M. 307(c)(4) sets forth the regulatory expression of that prohibition, directing that "[w]hat is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." The principle prohibits the prosecution from needlessly "pil[ing] on" charges against an accused. *United States v. Foster*, 40 M.J. 140, 144 n.4 (C.M.A. 1994), *overruled on other grounds by United States v. Miller,* 67 M.J. 385 (C.A.A.F. 2009) .

We utilize the following non-exhaustive list of factors in determining whether unreasonable multiplication of charges has occurred: (1) Did the accused object at trial; (2) Is each charge and specification aimed at distinctly separate criminal acts; (3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality; (4) Does the number of charges and specifications unreasonably increase the appellant's punitive exposure; and (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges? *Quiroz*, 55 M.J. at 338-39. The issue of unreasonable multiplication of charges involves the duty of this court to "'affirm only such findings of guilty, and the sentence . . . as it . . . determines, on the basis of the entire record, should be approved.'" *United States v. Butcher*, 56 M.J. 87, 93 (C.A.A.F. 2001) (quoting Art. 66(c), UCMJ).

While the remainder of the appellant's argument on this AOE lacks merit, after considering the *Quiroz* factors, we find three of the four obstruction specifications represent an unreasonable multiplication of charges since they are based upon the appellant's sending the single text, discussed *supra. See United States v. Guerrero*, 28 M.J. 223, 226-27 (C.M.A. 1989) (Act of simultaneously soliciting false testimony from two potential witnesses and charged as two separate crimes improper and required consolidation). Therefore, we will consolidate

Specifications 1, 5, and 6 of Charge III into one specification[14] and discuss, *infra*, whether to remedy this error by reassessing the sentence or returning the case for a sentence rehearing.

**4. Cumulative Error**

Under the cumulative-error doctrine, "a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding." *United States v. Banks*, 36 M.J. 150, 170-71 (C.M.A. 1992) (internal quotation marks and citation omitted). The cumulative effect of all plain and preserved errors is reviewed *de novo*. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011). This court will reverse only if it finds the cumulative errors denied the appellant a fair trial. *Banks*, 36 M.J. at 171.

The appellant argues that the military judge erred when he admitted: (1) a copy of "6MCD Operation Restore Vigilance" Campaign Plan; (2) a picture of the then-Commandant of the Marine Corps presenting an award to the great-grandfather of one of the victims; and (3) the appellant's commanding officer's testimony about the necessity of a harsh sentence. In order to resolve this AOE, we must first determine whether each of the actions individually constitute error. After doing so, and individually evaluating the prejudicial impact of any error, we do not find that disapproval of the findings is necessary.

**a. Admission of the Operation Restore Vigilance Campaign Plan**

After initial reports of the appellant's misconduct, Colonel (Col) Bowers, Commanding Officer, 6MCD, issued the Operation Restore Vigilance Campaign Plan (plan), which generally established measures for 6MCD to take in an effort to eliminate unethical and criminal behavior amongst recruiters, which he details at the beginning of the plan:

> This past fiscal year, the 6th MCD suffered 40 incidents of substantiated recruiter misconduct, with 19 of these incidents involving Marines engaging in inappropriate behavior with people of the opposite sex. This averages to more than three incidents per month in our communities, the end of a platoon's worth of once-promising Marines' careers, and the immeasurable hurt and pain inflicted upon once-proud family members. Not only is this <u>completely unacceptable</u>, but it also threatens to undermine the broader trust, confidence, and respect the American people have in their Marine Corps.[15]

---

[14] "In that Staff Sergeant Nhubu C. Chikaka, U.S. Marine Corps, Recruiting Station Atlanta, Sixth Marine Corps District, Eastern Recruiting Region, on active duty, did, at or near Douglasville, Georgia, on or about 8 August 2012, wrongfully endeavor to influence the actions of: Ms. L.B., Ms. B. J., and Ms. B.H., witnesses in the case of the said Staff Sergeant Chikaka, by discouraging their communication of information relating to violations of the Uniform Code of Military Justice to a person authorized to conduct or engage in an investigation, such conduct being to the prejudice of good order and discipline in the armed forces or of a nature to bring discredit upon the armed forces." This language omits the excepted language discussed *supra*.

[15] PE 14 at 1-2.

In the 10 pages that follow, the plan details Col Bowers' intent and the responsibilities of the chain of command in preventing and responding to allegations of recruiter misconduct.

The plan was offered by the prosecution *in limine*. The defense objected, arguing that the plan was irrelevant since it failed to make any "fact at issue more or less likely," and was unduly prejudicial since it was promulgated after the appellant allegedly committed most of the misconduct and would "confuse the issues".[16] Included in the MILITARY RULE OF EVIDENCE 403, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) objection was the defense argument that, "you have the [6MCD] CO talking all about this recruiter misconduct that's happened recently -- wink, wink -- September 2012 that we need to stamp out[.]"[17]

The prosecution countered that even after the plan was implemented, the appellant engaged in misconduct with LW. The military judge interpreted the Government's response as "[y]ou want to show that the accused was on notice to not engage in bad behavior."[18] The prosecution continued:

> [W]e're talking about a charge and specification that directly deals with inappropriate relationships almost a year after this directive came out. And this shows plan, intent on part of the accused, that he was trained and educated that such relationships were inappropriate. He had all the tools in his tool box to do the right thing, and yet he goes out of his way after being removed from recruiting duty to continue to engage with prospective applicants in an inappropriate manner.[19]

The defense then noted that the appellant was charged with violating only general orders, so knowledge was not an element: "It might be an issue in aggravation . . . . That's fine. We don't understand how it's relevant in that sense, sir, whether he was trained on this, whether he wasn't trained on it. . . . So we would also object on relevance grounds for that, sir."[20] The military judge conducted a MIL. R. EVID. 403 balancing test and sustained the objection. However, he invited a subsequent offer for admission if the prosecution could establish the plan's relevance and "if you can explain to me how it overcomes the hurdle of M.R.E. 403[.]"[21]

Major (Maj) McCutcheon, Commanding Officer, RS Atlanta -- a subordinate command of 6MCD -- was the appellant's commanding officer when the misconduct was first reported. He testified at trial that the appellant had attended a week-long training at which "ethics [and]

---

[16] Record at 322, 325.

[17] *Id*. at 320.

[18] *Id*. at 321.

[19] *Id*..

[20] *Id*. at 322.

[21] *Id*. at 325.

appropriate versus inappropriate relationships" were covered.[22]  Without addressing why the plan was admissible under MIL. R. EVID. 403, the prosecution again offered the plan into evidence, arguing it was "highly relevant to know the training and education the accused got especially since we have a situation where now he's moving from a canvassing recruiter to [RS Atlanta] and whether or not these orders -- plans still apply."[23]  Over a renewed objection, and without placing his MIL. R. EVID. 403 analysis on the record, the military judge admitted the plan into evidence.  After establishing that the plan went into effect in September 2012, the military judge provided a limiting instruction to the members:

> [S]ome of the charges were before that time period that the accused is accused of violating, or charged with violating.  So the [plan] would have no effect on him if it came after that.  But anything after September -- because there [are] dates on [the charge sheet] that go up through 2013 -- then that order would be applicable. So you could consider it for that purpose, his notice.  His familiarity with what would be required of him as a recruiter for the tendency, if any, that you think that it has on whether he violated the orders or not. . . .
>
> . . . .
>
> So that's my limiting instruction.  He is not charged with violating Colonel Bowers' Campaign Restore Vigilance order or program.  Okay. So that's the concern. . . . I am allowing it in this trial for its effect on what this accused knew or didn't know and how that impacted whether he violated these other violations [sic].  Again, one of the early arguments by the defense was to violate a general order doesn't necessarily require that you have knowledge of the order.  Okay.  So – and I will explain that when I explain the elements to you.  But for whatever weight you believe it has on [the charges related to LW]. . . .
>
> . . . .
>
> I think that was the main point because there was evidence that [LW] -- that he continues the relationship after he left [the appellant's assigned duty station]. Okay.  So this would go to knowledge, that's it.  He's not charged with violating it.[24]

Maj McCutcheon then testified that the plan was emailed to all-hands, that the appellant received it after moving to RS Atlanta, and that the appellant's new duties required no contact

---

[22] *Id*. at 685.

[23] *Id*. at 687.

[24] *Id*. at 687-88.

with poolees.[25] Maj McCutcheon also testified that the plan's purpose was "to ensure a greater ethical conduct with an emphasis on Sexual Assault Prevention and Response."[26]
After Maj McCutcheon's and before Col Bowers' testimony, the military judge *sua sponte* modified the basis upon which he found the plan admissible and again instructed the members: "[O]nce again, same issue. I assume [Col Bowers is] going to talk about the campaign plan as that's relevant for any charges involving [LW] or charges that occurred after this incident and how it relates to prejudicial good order and discipline, service discrediting, that kind of issue. You can consider it within those constraints."[27]

Col Bowers testified that the plan's purpose was to "[e]radicate sexual misconduct from the [6MCD] because we had a significant problem in my view," and that the plan prohibits recruiters from being alone with applicants of the opposite sex.[28] He further opined that "having a recruiter like SSgt Chikaka talking to poolees about how large his penis is or how well they give oral sex" was prejudicial to good order and discipline because "[t]his conduct is completely inappropriate. It goes against our core values. It goes against my written guidance and intent, which specifies to watch out for the degrading impact of unprofessional language. [The plan] talks about 'words perceive actions,' how this type of language" has no place in the Marine Corps and no place in 6MCD specifically.[29]

The military judge intervened and instructed the members that Col Bowers' opinion about the alleged crimes was not relevant. Only an opinion about "how it affects good order and discipline in the unit; that's what's admissible. Okay. So no member can think, 'Well, the Colonel doesn't like what's happened here allegedly so I must convict.'" The members all indicated that they "understood" this instruction.[30]

The prosecution next asked Col Bowers about disorder. Specifically, the trial counsel asked what "talking to a poolee about your penis or having sex with a poolee, what does that do within the community of trust, and how important is trust to the recruiting process?" Col Bowers responded, "I view that as a breach of trust with the American people. I have issued cards to every Marine in the [6MCD] with our three primary objections. The top objective is to reinforce and expand upon the trust of the American people. . . . and that is breach of trust in my view."[31] The defense did not cross-examine Col Bowers.

---

[25] *Id*. at 689.

[26] *Id*. at 686.

[27] *Id*. at 696.

[28] *Id*. at 699.

[29] *Id*. at 699-700.

[30] *Id*. at 700.

[31] *Id*.

11

In closing argument, the trial counsel used the plan to argue that the appellant knew what was required of him, and that although he knew about the plan, the appellant ignored it:

> Now, Col Bowers came in here and he talked to you about Campaign Restore Vigilance; yet another procedure in place to assure that the accused succeeds on recruiting duty. A campaign that was sent out to him through e-mail, that was taught at the RS training. Every month they hit on it. It was the Colonel's campaign plan for the entire [6MCD] on how to conduct business. And yet he's out in a bar with a prospective applicant.[32]

The appellant now argues that the military judge abused his discretion by admitting the plan, since it was irrelevant and failed to satisfy MIL. R. EVID. 403. The Government counters that the plan was relevant to show the impact the appellant's conduct with LW had on good order and discipline and whether or not that conduct was service discrediting.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." MIL. R. EVID. 401. However, the military judge "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needless presentating cumulative evidence." MIL. R. EVID. 403.

We review a military judge's evidentiary rulings for an abuse of discretion. *United States v. Dease*, 71 M.J. 116, 120 (C.A.A.F. 2012). When a military judge balances the competing interests in admitting or excluding evidence, the ruling will not be overturned unless there is a clear abuse of discretion. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000). When a military judge fails to articulate a MIL. R. EVID. 403 balancing analysis on the record, the ruling receives less deference. *Id.* When the judge fails to even conduct the MIL. R. EVID. 403 analysis, the ruling receives no deference at all. *Id.* Since the military judge failed to conduct this analysis at trial, we are unable to afford his ruling on this matter any deference.

We begin by recognizing that the prosecution was required to prove beyond a reasonable doubt that the Article 134 charges were "to the prejudice of good order and discipline" or "of a nature to bring discredit upon the armed forces," and that it is on these grounds that the military judge ultimately admitted the plan. MCM, Part IV, ¶ 60(b)(2). However, while the plan was perhaps minimally relevant in this regard, any such probative value was dwarfed by the risk of unfair prejudice.

First, any relevant, probative information in the plan was ultimately cumulative, since both Maj McCutcheon and Col Bowers testified about the terminal elements. Moreover, that Col Bowers created the plan within weeks after the appellant's misconduct and its account of "substantiated recruiter misconduct" created the risk of the members concluding that the command "substantiated" the appellant's misconduct and had to institute significant reactive measures as a result. Published guidance about "completely unacceptable" behavior exacerbated

---

[32] *Id.* at 789.

12

the risk that the members would unfairly factor Col Bowers' previous substantiation and very obvious concerns into their deliberations, verdict, and sentence. The military judge's curative instruction did not obviate this risk. In fact, contradictory instructions about how the members could consider the plan created risks of inadvertently misleading or confusing them.[33] Because the probative value of this evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the members, or needless presentation of cumulative evidence, the military judge abused his discretion in admitting it.

Since the danger of unfair prejudice was sufficient to render the evidence inadmissible, we must analyze whether any prejudice actually occurred. Whether the erroneous admission of evidence was harmless is a question of law that we review *de novo*. *United States v. Walker*, 57 M.J. 174, 178 (C.A.A.F. 2002); *United States v. Grijalva*, 55 M.J. 223, 228 (C.A.A.F. 2001). "When a military judge abuses his discretion in the M.R.E. 403 balancing analysis, the error is nonconstitutional." *United States v. Solomon*, 72 M.J. 176, 182 (C.A.A.F. 2013) (citing *United States v. Berry*, 61 M.J. 91, 97 (C.A.A.F. 2005)). The Government must "demonstrate that the error did not have a substantial influence on the findings." *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003). In making this determination, we weigh the strength of the prosecution's case, the strength of the defense case, the materiality of the evidence in question, and the quality of the evidence in question. *United States v. Barnett*, 63 M.J. 388, 397 (C.A.A.F. 2006).

The prosecution's case was powerful. Multiple victims testified that the appellant used his position and the same modus operandi to repeatedly engage in similar predatory misconduct. This testimony was supported by pictures, a text message, and records of hundreds of text messages and phone calls. Significantly, when confronted with his misconduct by the boyfriend of one of his victims prior to any report, the appellant apologized.

Conversely, the defense relied upon testimony of former recruits that the appellant never acted unprofessionally around them, the victims' minor inconsistent statements, evidence that one victim declined a request for her personal cell phone during the investigation, and affidavits attesting to the appellant's military character. Although we recognize the plan may have been material and the risk of prejudice substantial, the overwhelming strength of the prosecution's case convinces us that the plan did not substantially influence the findings. We hold the error was therefore harmless on findings. We analyze the prejudicial impact on sentencing, *infra*.

### b. Photo of Former Commandant Admitted at Sentencing

At sentencing, the trial counsel sought to introduce a picture of a testifying victim's great-grandfather posing with the Commandant of the Marine Corps after an award presentation, offered as evidence that the victim "came from a family of Marines" and therefore wanted to continue that tradition.[34] The defense objected, citing MIL. R. EVID. 403. In admitting the photo,

---

[33] The plan was not relevant to show knowledge. Knowledge of the general order was not a "fact of consequence" in these proceedings. MIL. R. EVID. 401.

[34] Record at 858.

the military judge ruled that "[i]t's probative value is not substantially outweighed by the danger of unfair prejudice to the accused or to confusion of the issues by the members or misleading the members or any other factor under M.R.E. 403. It has probative value based upon this witness' testimony about why she joined the Marine Corps."[35]

R.C.M. 1001(b)(4) provides that "[t]he trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." This evidence is subject to the balancing test of MIL. R. EVID. 403, *United States v. Stephens,* 67 M.J. 233, 235 (C.A.A.F. 2009), and we afford the military judge broad discretion to determine whether to admit sentencing evidence in aggravation, *United States v. Clemente*, 50 M.J. 36, 37 (C.A.A.F. 1999). When the military judge conducts a MIL. R. EVID. 403 analysis on the record, as here, we afford his decision deference and "exercise great restraint" in reviewing his ruling. *United States v. Harris*, 46 M.J. 221, 225 (C.A.A.F. 1997). Applying that standard here, we find no abuse of discretion in his decision to admit the photo.

### c. Commanding Officer's Testimony Urging a Harsh Sentence

Maj McCutcheon testified at sentencing that the Marines at his command are aware of the appellant's court martial; the command will build a "case study" of the appellant's circumstances, including the sentence; the command will then present that case study to Marines in the command to "let the Marines kind of absorb that . . . [a]nd [know that] if you choose to still go away from that prevention, these are – this is the window that's opened that you're going to pass through."[36] From that foundation, the following colloquy between the trial counsel and the Maj McCutcheon ensued:

Q: So you brief your canvassing recruiters on the consequences, a.k.a. the sentence of a case study like this one?
A: That is correct.

Q: Can you explain to the members how important it is to set a strong example for general deterrence in 6th Marine Corps District as a whole?
A: Yes. . . . If you – if this type of thing, any type of misconduct, fraudulent enlistment, some kind of crime out in town, driving under the influence, those are all bad. But if you have something that completely goes against what we stand for, preys upon a weaker group of people, younger, they're less experienced; in many cases they're juveniles, 17. . . . [A]nd we say, "Hey, if we're just going to treat that lightly." So . . . there's maybe . . . a precedent set that it's somewhat on par with someone who gets a DUI or that it didn't listen when a parent said "Well, he had surgery when he was 12." "Well, I don't know if I want to bring that up because I'm afraid this kid won't be able to join." To me there's no parallel there. So [the sentence] needs to be something that says, "If you do this, everything around you, generally speaking, is going to stop." And Marines that are

---

[35] *Id*. at 858-59.

[36] *Id*. at 871.

potentially in a vulnerable window – for whatever reason – that might be predisposed to [commit similar misconduct] would see that as a deterrent and say that, "There's no middle ground. There's no way to . . . negotiate out of this. There's no way to lessen the blow. It's a significant blow. It's something I do not want to have happen to me."[37]

The trial counsel reminded the members of the commanding officer's testimony and the Campaign Plan as he argued for 10 years of confinement and a dishonorable discharge: "General deterrence is a big issue, and we want to talk about everything the RS CO talked about, Campaign Restore Vigilance, the need to send a strong message inside the Marine Corps . . . [to] all the canvassing recruiters out there right now that might be teetering . . . [w]e need a strong message that this -- this misconduct will not be tolerated."[38]

Although no objection was lodged at trial, the appellant now argues that Maj McCutcheon's testimony to "the members [that] they needed to give a harsh sentence to be used as an example to others" was inadmissible sentencing evidence, and that "the danger of unfair prejudice is plain." Further, the appellant argues the prejudicial effect was further enhanced by one of the members knowing Maj McCutcheon well and being assigned to 6MCD at the time of trial, where he was directly subordinate to Col Bowers. The Government counters that this testimony "was appropriate sentencing evidence and properly informed the [m]embers' consideration of the effect their sentence would have within the Recruiting District."

Failure to object to the admission of evidence at sentencing forfeits appellate review of the issue absent plain error. *See United States v. Eslinger*, 70 M.J. 193 197-98 (C.A.A.F. 2011). To prevail under a plain error analysis, the appellant bears the burden of showing that: there was an error; it was plain or obvious; and the error materially prejudiced a substantial right. *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005).

**(1) There was Plain Error**

First, we concur with the appellant that Maj McCutcheon's testimony was a plea for the members to award a harsher sentence as an example to other Marine recruiters within the command. While general deterrence is a relevant factor in sentencing arguments, *see United States v. Akbar*, 74 M.J. 364, 394 (C.A.A.F. 2015) (trial counsel are free to argue general deterrence during their sentencing statement provided they do not rely exclusively upon that consideration), that relevancy neither trumps R.C.M. 1001(b) nor eliminates the necessity to comply with MIL. R. EVID. 403.

R.C.M. 1001(a)(1) states that "[a]fter findings of guilty have been announced, the prosecution and defense may present matter *pursuant to this rule* to aid the court-martial in determining an appropriate sentence." (Emphasis added). The rule then permits the Government to offer service data from the charge sheet, personal data and character of prior service of the

---

[37] *Id*. at 871-72. Civilian Defense Counsel cross-examined the witness and established that the command had already experienced a deterrent effect since misconduct had decreased considerably.

[38] *Id*. at 892-93.

accused, evidence of prior convictions of the accused, evidence in aggravation, and evidence of rehabilitative potential. R.C.M. 1001(b)(1)-(5). Evidence in aggravation is "any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty" and includes "evidence of significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense." R.C.M. 1001(b)(4).

Maj McCutcheon's testimony did not fall into any R.C.M. 1001(b) category. It specifically did not directly relate to or result from the accused's offense. Instead, it related only to general deterrence -- the prospective utility of the appellant's sentence, the singular purpose of which was to send a message to the members that the command wanted a sentence harsh enough to stop a problem that the members had already heard was pervasive. Although the trial counsel may argue general deterrence, that sentencing principle does not provide a basis for ignoring the limitations of R.C.M. 1001(b).

Moreover, our sentencing jurisprudence has long recognized that testimony regarding an appropriate sentence is plainly improper under R.C.M. 1001(b), especially when the witness is the accused's commander. *See United States v. Horner,* 22 M.J. 294, 296 (C.M.A. 1986) (holding testimony regarding commander's opinion as to the type of punishment which should be adjudged for a particular crime improper: "[i]t would be ironic and absurd if R.C.M. 1001(b)(5) were construed to allow the parties to call witnesses simply for the purpose of telling the court-martial what offenses, in the witnesses' estimation, require punitive discharges or lengthy confinement, etc."); *United States v. Pearson,* 17 M.J. 149, 153 (C.M.A. 1984) (holding that when command witness implied that the entire unit was hanging on the outcome of the trial, the "fundamental sanctity of the court-martial was violated" since "the court-martial alone is entrusted with the responsibility of representing the community in arriving at an appropriate sentence for an accused."). That case law reflects a determination that testimony about sentence severity is simply not helpful to the members and can implicate undue command influence concerns. *See United States v. Griggs*, 61 M.J. 402, 409 (C.A.A.F. 2005); *United States v. Cherry*, 31 M.J. 1, 5 (C.M.A. 1990). While much of that jurisprudence relates to improper opinions as evidence of rehabilitative potential under R.C.M. 1001(b)(5), the logic for the prohibition applies equally to the same testimony provided under the guise of "general deterrence." As our superior court noted decades ago, "The question of appropriateness of punishment is one which must be decided by the court-martial; it cannot be usurped by a witness. Thus, for the same reasons we do not permit an opinion of guilt or innocence, or of 'truthfulness' or 'untruthfulness' of witnesses, we do not allow opinions as to appropriate sentences." *United States v. Ohrt*, 28 M.J. 301, 305 (C.M.A. 1989) (citations omitted). While it can be proper for an appellant's commanding officer to testify about the impact of the appellant's crimes on the unit, *see* R.C.M. 1001(b)(4), it is plainly improper to testify that the misconduct should be dealt with harshly.

Finally, even if the testimony was admissible under R.C.M. 1001(b), it was barred by MIL. R. EVID. 403. The Government concedes that the purpose of the testimony was to inform the members that, "if they provided a significant sentence, it would, in fact, provide a deterrent effect within the Sixth Recruiting District." But we doubt very much that members require testimony to understand that a harsher sentence may have a greater impact on general deterrence.

Such an intuitive conclusion renders the probative value of this testimony slight, and when the testimony comes from the commanding officer, the threat of unlawful command influence generates a substantial risk of unfair prejudice. For this reason, military judges are wise to balance carefully the adverse testimony of an appellant's seniors. *See United States v. Gordon*, 31 M.J. 30 (C.M.A. 1990) (holding that using a brigade commander to testify about impact of negligent homicide on unit was improper sentencing evidence.); *United States v. Sanford*, 29 M.J. 413, 415 (C.M.A. 1990) (holding using a battalion commander to testify about impact of drug abuse was improper. "Though less blatant than other forms of command influence . . . the practical effect of edifying a court-martial with a commander's general views can be the same."); *United States v. Elsinger*, 69 M.J. 522, 534 n.12 (Army Ct.Crim.App. 2010) ("[U]sing senior level commanders as government sentencing witnesses is often problematic." (Citations omitted)), *aff'd*, 70 M.J. 193 (C.A.A.F. 2011). In this case, the commanding officer's opinion that a harsh sentence was required clearly ran afoul of Mil. R. Evid. 403.

### (2) The Error Materially Prejudiced a Substantial Right

In evaluating prejudice, we note that members sentenced the appellant. While "[t]he experienced and professional military lawyers who find themselves appointed as trial judges" are assumed to be able to appropriately consider only relevant material in assessing sentencing, the same cannot be said for members. *United States v. McNutt*, 62 M.J. 16, 26 (C.A.A.F. 2005) (quoting *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (Crawford, J., concurring in part and dissenting in part) (additional citation omitted)). Members are less likely to be able to separate relevant matters and make decisions based solely on admissible evidence. *See United States v. Wingart*, 27 M.J. 128, 136 (C.M.A. 1988). Moreover, the members were all junior to Maj McCutcheon and knew him to be the appellant's former commanding officer. While rank and position alone do not support a finding of prejudice, we are mindful of the additional weight junior members may afford the opinion of an appellant's commanding officer. We also recognize that the E-8 member, himself a career recruiter, knew and worked with Maj McCutcheon, and both were serving in billets subordinate to Col Bowers, whose opinion on the impact of the appellant's misconduct was well known. Finally, the trial counsel reminded the members of Maj McCutcheon's testimony during sentencing arguments.

When determining whether an error prejudiced the appellant's sentence, we must determine if the error "had a prejudicial impact on the process by which the members determined the appropriate punishment." *United States v. Reyes*, 63 M.J. 265, 267 (C.A.A.F. 2006). In this context, the test for prejudice is whether "the panel might have been 'substantially swayed' by the error during the sentencing process[.]" *Id.* (citations omitted).

We are satisfied that either the erroneously admitted plan or the commanding officer's sentencing testimony, on their own, could have "substantially swayed" the members.[39] Combine the two and we are left convinced it is so -- as reflected in the fact that they adjudged two years

---

[39] While we hold that admitting the plan and Maj McCutcheon's testimony was error, we do not find that those errors rise to the level of depriving the appellant of a fair trial. *See Banks*, 36 M.J. at 171.

more confinement than the trial counsel requested.  We will take corrective action in our decretal paragraph. [40]

## 5.  Speedy Post-Trial Processing

Finally, the appellant claims that he was denied his right to speedy post-trial review.  He was sentenced on 14 March 2014.  Thereafter, the following dates and events are relevant:

-On 23 June 2014, less than 120 days later, the Convening Authority initially acted;
-On 2 July 2014, the case was docketed with this court;
-On 20 August 2014, in response to the appellant's request for new post-trial processing, this court ordered the production of documents;
-On 28 August 2014, the documents were received;
-On 3 September 2014, the appellant's motion for new post-trial processing was denied and  the appellant's motion to attach documents was granted;
-On 5 January 2015, after the appellant had been granted five enlargements of time, his Brief was submitted;
-On 5 May 2015, following three Government enlargements of time with the appellant's consenting to the first two, the Government's file its Answer;
-On 10 June 2015, after requesting two enlargements of time, the appellant filed his Reply Brief;
-On 24 June 2015, after consideration of the parties' full briefs, this court set aside the convening authority's action and remanded the case for new post-trial processing in order to afford the appellant the full opportunity to submit clemency matters;
-On 27 July 2015, a new SJAR was served on the appellant's counsel;
-On 26 August 2015, after requesting an extension of time to submit clemency matters, the appellant provided clemency matters, wherein he requested speedy post-trial review;
-On 11 September 2015, the Convening Authority took action on the case once again;
-On 5 October 2015, the case was re-docketed at this court;
-On 4 November 2015, the appellant filed a Supplemental Brief assigning a total of 13 errors;
-on 27 January 2016, after two enlargements of time, both of which the appellant opposed, the Government filed its Supplemental Answer;
-On 29 January 2016, the appellant filed a motion for oral argument;
-On 24 February 2016, oral arguments were heard;
-On 12 April 2016, this opinion was issued.

Convicted service members "have a due process right to timely review and appeal of courts-martial convictions." *United States v. Merritt*, 72 M.J. 483, 489 (C.A.A.F. 2013) (internal quotation marks and citation omitted).  We review claims that this right was violated *de novo*. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006).  "In analyzing whether appellate delay has violated the due process rights of an accused we first look at whether the delay in question is facially unreasonable." *United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F. 2006) (citation omitted).

---

[40] The appellant also argues that these actions amounted to unlawful command influence by bringing "the messaging related to the Heritage Tour into the courtroom and into [the appellant's] trial."  However, the record contains no information indicating that any of the members were present or aware of the former Commandant's "Heritage Brief" or the statements he made therein.  Without such evidence, this argument (AOE 10) is without merit.

If the delay is facially unreasonable, then we balance the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), which include: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. *See Moreno*, 63 M.J. at 135-36. In balancing the four factors, no single factor is required to find that post-trial delay constitutes a due process violation. *Id.* at 136. If we conclude that an appellant has been denied the due process right to speedy post-trial review and appeal, "we grant relief unless we are convinced beyond a reasonable doubt that the constitutional error is harmless." *Allison*, 63 M.J. at 370 (internal quotation marks and citation omitted). Whether an appellant has been denied the due process right to a speedy post-trial review and whether constitutional error is harmless beyond a reasonable doubt are reviewed *de novo*. *Id*.

In some cases it may be appropriate to assume error and "proceed[] directly to the conclusion that any error was harmless [beyond a reasonable doubt]." *Id.* Here, we will assume the delay of nearly 24 months to complete appellate review denied the appellant his right to a speedy review and turn to the question of whether any error was harmless beyond a reasonable doubt.

Initially we address the appellant's specific allegations of prejudice. The first is that the CA, with whom he "previously negotiated and who was willing to approve a pretrial agreement with terms more favorable," had transferred by the time the appellant submitted clemency, arguably depriving him of the CA more disposed to grant clemency. As a related matter, the appellant also asserts the new CA could not have reviewed the entire record of trial before acting.

These arguments assume too much. Even without a change of command, there is no certainty of the CA with whom he had negotiated being the one to consider his clemency material. Convening authorities travel for various reasons, leaving acting commanders to carry on the business of the command or other convening authorities to act on all of the unit's courts-martial. The notion that his clemency appeal would have resulted in more favorable treatment from his original CA is mere speculation. To infer that a CA willing to limit approved punishment in exchange for a guilty plea would necessarily approve that same limit after the appellant exercised his right to a contested trial is illogical. Finally, we find no merit in the appellant's complaint that the CA failed to sufficiently familiarize himself with the record of trial. Such conjecture does not overcome the "presumption of regularity" that we apply to a Convening Authority's actions. *United States v. Parker*, 71 M.J. 594, 626 (N.M.Ct.Crim. App. 2012) (citations omitted).

Next, the appellant claims that he was prejudiced by incurring total forfeitures and is thus unable to afford his choice of counsel should this court grant relief. Even were we to find merit in such a claim, the relief to be provided by this court would not require a rehearing.

Finally, the appellant argues that any delay here is so egregious that "tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In considering the totality

19

of the circumstances, the entire record, and the fact that the relief we provide will not result in a rehearing, we conclude that any error was harmless beyond a reasonable doubt.

**Conclusion**

Specifications 1, 5, and 6 of Charge III are consolidated into a single specification as set forth *supra*. The finding as to the consolidated specification and the remaining approved findings are affirmed. However, relief is warranted in light of the unreasonably multiplied specifications of Charge III and the erroneously admitted evidence considered on sentencing. Adhering to the principles set forth by our superior court in *United States v. Sales*, 22 M.J. 305 (C.A.A.F. 1986) and *United States v. Winckelmann*, 73 M.J. 11 (C.A.A.F. 2013), we are confident we can reassess the appellant's sentence to obviate the impact of these errors. *United States v. Moffeit*, 63 M.J. 40, 41 (C.A.A.F. 2006). Accordingly, we affirm only so much of the sentence that includes total forfeitures, reduction to pay grade E-1, confinement for five years, and a dishonorable discharge.

Senior Judge FISCHER and Judge CAMPBELL concur.

For the Court



R.H. TROIDL
Clerk of Court

APPENDIX A

1. THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN, OVER DEFENSE OBJECTION, HE ADMITTED ON THE MERITS "OPERATION RESTORE VIGILANCE," A CAMPAIGN PLAN TO "FULLY *OPERATIONALIZE* THE COMMANDANT'S GUIDANCE" FROM THE HERITAGE TOUR; A PHOTO OF THE COMMANDANT POSING WITH AN ACCUSER'S GRANDFATHER AS SENTENCING EVIDENCE; AND THEN ALLOWED APPELLANT'S COMMANDING OFFICER TO TESTIFY THAT IT WAS IMPORTANT FOR THE MEMBERS TO ADJUDGE A HARSH SENTENCE IN THIS CASE.

2. THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE ALLOWED A WITNESS TO TESTIFY THAT THE APPELLANT OBSTRUCTED JUSTICE, WHICH WAS UNCHARGED MISCONDUCT AND SO IN VIOLATION OF MILITARY RULE OF EVIDENCE 404(b), AND THEN INSTRUCTED THE MEMBERS, OVER DEFENSE OBJECTION, THAT THEY COULD USE THIS EVIDENCE TO DETERMINE THAT HE OBSTRUCTED JUSTICE IN THE FOUR CHARGED INSTANCES.[41]

3. THE APPELLANT WAS DENIED THE RIGHT TO SUBMIT CLEMENCY MATTERS TO THE CONVENING AUTHORITY.[42]

4. DISJUNCTIVE PLEADING IS IMPROPER BECAUSE IT CREATES AMBIGUITY AND MAY FAIL TO INFORM AN ACCUSED OF WHAT HE MUST DEFEND AGAINST. HERE, THE GOVERNMENT CHARGED 18 SPECIFICATIONS WITH ALTERNATE THEORIES OF LIABILITY, ALL PLEADED DISJUNCTIVELY TO CREATE 65 POSSIBLE THEORIES OF LIABILITY. THE MEMBERS' GENERAL VERDICT OF GUILT WITHOUT EXCEPTIONS OR SUBSTITUTIONS CREATED AN AMBIGUOUS VERDICT THAT PREVENTS THIS COURT FROM REVIEWING THIS CASE FOR FACTUAL SUFFICIENCY.[43]

5. THE GOVERNMENT MUST PROVE EACH ELEMENT OF AN OFFENSE BEYOND A REASONABLE DOUBT. HERE, THE GOVERNMENT FAILED TO SATISFY EACH ELEMENT OF OBSTRUCTING JUSTICE RENDERING THIS CONVICTION LEGALLY AND FACTUALLY INSUFFICIENT.

6. OBSTRUCTING JUSTICE REQUIRES THE ELEMENT OF SPECIFIC INTENT TO INFLUENCE, IMPEDE, OR OTHERWISE OBSTRUCT THE DUE ADMINISTRATION OF JUSTICE, YET THIS ELEMENT WAS NOT ALLEGED. THEREFORE THE SPECIFICATIONS ALLEGING OBSTRUCTION OF JUSTICE DO NOT STATE AN OFFENSE.

---

[41] AOEs 2 and 6 were considered and are without merit. *United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).

[42] AOE 3 was resolved when the court ordered new post-trial processing.

[43] AOE 4 has been reviewed and is without merit. *United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992). *See United States v. Brown*, 65 M.J. 356, 359-60 (C.A.A.F. 2007) (quoting *United States v. Vidal*, 23 M.J. 319, 325 (C.M.A. 1987)); *United States v. Miles*, 71 M.J. 671, 673 (N.M.Ct.Crim.App. 2012).

7. WHAT IS SUBSTANTIALLY ONE TRANSACTION SHOULD NOT BE MADE THE BASIS FOR AN UNREASONABLE MULTIPLICATION OF CHARGES. THE GOVERNMENT CHARGED STAFF SERGEANT CHIKAKA WITH THREE SPECIFICATIONS OF OBSTRUCTION OF JUSTICE FOR SENDING ONE TEXT MESSAGE AND WITH FIVE OFFENSES FOR ONE INAPPROPRIATE RELATIONSHIP WITH ONE RECRUIT APPLICANT. THIS CHARGING SCHEME AMOUNTS TO AN UNREASONABLE MULTIPLICATION OF CHARGES.

8. DUE PROCESS REQUIRES SPEEDY POST-TRIAL PROCESSING OF AN APPELLANT'S CASE. HERE, THE GOVERNMENT FAILED TO MEET THE ESTABLISHED STANDARDS FOR TIMELINESS AND COMPLETENESS IN POST-TRIAL PROCESSING AND SO VIOLATED SSGT CHIKAKA'S RIGHT TO DUE PROCESS.

9. EQUAL PROTECTION REQUIRES THE LAW TO TREAT SIMILARLY-SITUATED PEOPLE ALIKE. ARTICLE 134, UCMJ, ADULTERY DISPARATELY TREATS HETEROSEXUALS AND HOMOSEXUALS IN TWO WAYS: (1) IT APPLIES ONLY TO HETEROSEXUALS BY REQUIRING SEXUAL INTERCOURSE FOR CRIMINAL LIABILITY AND PUNISHMENT; (2) IT DENIES HOMOSEXUALS THE SAME MARRIAGE-FOSTERING ENFORCEMENT OF FIDELITY AFFORDED HETEROSEXUALS. THEREFORE HIS CONVICTION SHOULD BE SET ASIDE.[44]

10. ARTICLE 37(a), UCMJ, PROHIBITS UNLAWFUL COMMAND INFLUENCE OVER A COURT-MARTIAL. HERE, THE TRIAL COUNSEL ENTERED INTO EVIDENCE "OPERATION RESTORE VIGILANCE," A CAMPAIGN PLAN TO "FULLY *OPERATIONALIZE* THE COMMANDANT'S GUIDANCE" FROM THE HERITAGE TOUR; A PHOTO OF THE COMMANDANT POSING WITH AN ACCUSER'S GRANDFATHER; AND SOLICITED TESTIMONY FROM APPELLANT'S COMMANDING OFFICER THAT IT WAS IMPORTANT FOR THE MEMBERS TO ADJUDGE A HARSH SENTENCE IN THIS CASE, THEREBY INSERTING UNLAWFUL COMMAND INFLUENCE INTO THE TRIAL.

11. THE MILITARY JUDGE ABUSED HIS DISCRETION IN FAILING TO SUPPRESS TESTIMONY CONCERNING THE CONTENTS OF TEXT MESSAGES WHEN THE GOVERNMENT FAILED TO PRESERVE EVIDENCE OF THE MESSAGES THEMSELVES, AND THE MESSAGES WERE LOST OR DESTROYED BY THE COMPLAINING WITNESSES BEFORE THE TRIAL COURT COULD COMPEL THEIR DISCOVERY.[45]

12. JOINDER OF ADDITIONAL CHARGES POST ARRAIGNMENT IS PERMISSIBLE ONLY WITH THE CONSENT OF THE ACCUSED. HERE, APPELLANT OBJECTED TO JOINDER OF ADDITIONAL CHARGES. THE CONVENING AUTHORITY THEN

---

[44] AOE 9 was considered and is without merit in light of this court's recent holding in *United States v. Hackler*, __ M.J. __, No. 201400414 (N.M.Ct.Crim.App. 17 Mar 2016).

[45] AOEs 11, 12, and 13, raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), have been considered and are without merit. *Clifton*, 35 M.J. at 81.

WITHDREW AND DISMISSED THE PENDING CHARGES SIMPLY TO RE-PREFER AND RE-REFER TOGETHER WITH THE CHARGES FOR WHICH THE GOVERNMENT SOUGHT JOINDER, WHICH IS IMPROPER UNDER R.C.M. 604(b).

13. THE MILITARY JUDGE ABUSED HIS DISCRETION BY FAILING TO GRANT AN ADDITIONAL DEFENSE-REQUESTED CONTINUANCE IN ORDER TO ALLOW FACEBOOK ADDITIONAL TIME TO COMPLY WITH OR REFUSE TO COMPLY WITH THE COURT'S SUBPOENA AND WARRANT OF ATTACHMENT.